# UNITED STATES DISTRICT COURT

for the

Southern District of Ohio

Redacted Affidavit
Original filed on 12/10/23

| | |
|---|---|
| In the Matter of the Search of | ) |
| *(Briefly describe the property to be searched or identify the person by name and address)* | ) |
| THE CELLULAR TELEPHONE ASSIGNED CALL NUMBER 937-716-0118 AND INFORMATION ASSOCIATED WITH THAT NUMBER THAT IS IN THE CUSTODY OR CONTROL OF AT&T | ) ) ) ) |

Case No.   3:23-MJ-532

## APPLICATION FOR A WARRANT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:

See Attachment A

located in the _____ Southern _____ District of _____ Florida _____, there is now concealed *(identify the person or describe the property to be seized)*:

See Attachment B

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

- ☑ evidence of a crime;
- ☐ contraband, fruits of crime, or other items illegally possessed;
- ☐ property designed for use, intended for use, or used in committing a crime;
- ☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 21 U.S.C. §§ 841, 843, and 846 | Possession with intent to distribute controlled substances; Use of a communication facility to commit a felony; Conspiracy to commit a Title 21 offense |

The application is based on these facts:

See Affidavit in Support of Application for Search Warrant.  To ensure technical compliance with 18 U.S.C. 3121-3127, the requested warrant will also function as a pen register order.  I thus certify that the information likely to be obtained is relevant to an ongoing criminal investigation being conducted by the DEA. See 18 U.S.C. 3122(b), 3123(b). /s AUSA Kelly K. Rossi

- ☑ Continued on the attached sheet.
- ☑ Delayed notice of __30__ days *(give exact ending date if more than 30 days: _____ )* is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

_____
*Applicant's signature*

DEA TFO Gregory Orick
*Printed name and title*

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by
_____ Telephone _____ *(specify reliable electronic means)*.

Date:   12/10/23

City and state:  Dayton, Ohio

_____
Peter B. Silvain, Jr.
United States Magistrate Judge

## <u>ATTACHMENT A</u>

## **Property to Be Searched**

1. The cellular telephone assigned call number 937-716-0118**,** with unknown listed
   subscriber(s) (the "Target Cell Phone"), whose service provider is AT&T Wireless
   ("AT&T"), a wireless telephone service provider headquartered at 11760 U.S. Highway
   1, North Palm Beach, FL 33408.

2. Records and information associated with the Target Cell Phone that is within the
   possession, custody, or control of AT&T**,** including information about the location of the
   cellular telephone if it is subsequently assigned a different call number.

<u>**ATTACHMENT B**</u>

**Particular Things to be Seized**

I.     **Information to be Disclosed by the Provider**

1.  *Historical and Subscriber Information*. To the extent that the information described in
    Attachment A is within the possession, custody, or control of the Provider, including any
    information that has been deleted but is still available to the Provider or that has been
    preserved pursuant to a request made under <u>18 U.S.C. § 2703(f)</u>, the Provider is required
    to disclose to the government the following information pertaining to the Account listed
    in Attachment A for the time period **April 1, 2023, to present**:

    a.  The following information about the customers or subscribers of the Account:

        i.    Names (including subscriber names, user names, and screen names);
        ii.   Addresses (including mailing addresses, residential addresses, business
              addresses, and e-mail addresses);
        iii.  Local and long distance telephone connection records;
        iv.   Records of session times and durations, and the temporarily assigned
              network addresses (such as Internet Protocol ("IP") addresses)
              associated with those sessions;
        v.    Length of service (including start date) and types of service utilized;
        vi.   Telephone or instrument numbers (including MAC addresses, Electronic
              Serial Numbers ("ESN"), Mobile Electronic Identity Numbers
              ("MEIN"), Mobile Equipment Identifier ("MEID"); Mobile
              Identification Number ("MIN"), Subscriber Identity Modules ("SIM"),
              Mobile Subscriber Integrated Services Digital Network Number
              ("MSISDN"); International Mobile Subscriber Identity Identifiers
              ("IMSI"), or International Mobile Equipment Identities ("IMEI");
        vii.  Other subscriber numbers or identities (including the registration
              Internet Protocol ("IP") address); and
        viii. Means and source of payment for such service (including any credit card
              or bank account number) and billing records.

    b.  All records and other information (not including the contents of communications)
        relating to wire and electronic communications sent or received by the Account,
        including:

        i.    the date and time of the communication, the method of the
              communication, and the source and destination of the communication –
              i.e., call detail records - and records of data events across all networks
              (3G, 4G, 5G)
        ii.   All historical location information, including data about which "cell
              towers" (i.e., antenna towers covering specific geographic areas) and

"sectors" (i.e., faces of the towers) received a radio signal from the Target Cell Phone for the time period **April 1, 2023, to present**. Included is any specialized location data commonly referred to as Network Element Location Service (NELOS), AriesoGeo, Per Call Measurement Data (PCMD), Real Time Tool (RTT), and/or Timing Advance/TruCall.

c. The Provider shall deliver the information set forth above within **7 days** of the service of this warrant and the PROVIDER shall send the information via facsimile or United States mail, and where maintained in electronic form, on CD-ROM or an equivalent electronic medium, to:

> Drug Enforcement Administration
> Attn: TFO Gregory Orick
> 3821 Colonel Glenn Hwy
> Beavercreek, OH 45342

2. *Prospective Location Information*. The Provider shall provide all prospective location information about the location of the **TARGET CELL PHONE** described in Attachment A for a period of **thirty days**, during all times of day and night. "Information about the location of the **TARGET CELL PHONE**" includes all available E-911 Phase II data, GPS data, latitude-longitude data, and other precise location information, as well as all data about which "cell towers" (i.e., antenna towers covering specific geographic areas) and "sectors" (i.e., faces of the towers) received a radio signal from the cellular telephone described in Attachment A. To the extent that the location information is within the possession, custody, or control of Provider, Provider is required to disclose the Location Information to the government. In addition, Provider must furnish the government all information, facilities, and technical assistance necessary to accomplish the collection of the Location Information unobtrusively and with a minimum of interference with Provider's services, including by initiating a signal to determine the location of the **TARGET CELL PHONE** on Provider's network or with such other reference points as may be reasonably available, and at such intervals and times directed by the government.

3. *Prospective Pen-Trap Information*. Pursuant to 18 U.S.C. § 3123, the DEA may install and use pen-trap devices to record, decode, and/or capture dialing, routing, addressing, and signaling information associated with each communication to or from the cell phones identified in Attachment A, including the date, time, and duration of the communication, and the following, without geographic limit:

- IP addresses associated with the cell phone device or devices used to send or receive electronic communications
- Identity of accounts that are linked by creation IP address, recovery email, telephone number, or other identifiers
- Identity of all accounts that are linked to the account by cookies

2

- Any unique identifiers associated with the cell phone device or devices used to make and receive calls with the cell phone identified in Attachment A, or to send or receive other electronic communications, including the ESN, MEIN, IMSI, IMEI, SIM, MSISDN, or MIN
- IP addresses of any websites or other servers to which the cell phone device or devices connected
- Source and destination telephone numbers and email addresses
- "Post-cut-through dialed digits," which are digits dialed after the initial call set up is completed, subject to the limitations of 18 U.S.C. § 3121(c)
- Source and destination telephone numbers
- Date, time, and duration of communication
- All data about the cell towers (i.e. antenna towers covering specific geographic areas) and sectors (i.e. faces of the towers) to which the Target Cell Phone will connect at the beginning and end of each communication. Included is any specialized location data commonly referred to as Network Element Location Service (NELOS), AriesoGeo, Per Call Measurement Data (PCMD), Real Time Tool (RTT), and/or Timing Advance/TruCall.

Pursuant to 18 U.S.C. § 3123(c)(1), the use and installation of the foregoing is authorized for **thirty days** from the date of this Order. Provider must furnish the government all information, facilities, and technical assistance necessary to accomplish the collection of the Location Information unobtrusively and with a minimum of interference with Provider's services, including by initiating a signal to determine the location of the **TARGET CELL PHONE** on Provider's network or with such other reference points as may be reasonably available, and at such intervals and times directed by the government.

## II.     Information to be Seized by the Government

1. All information described above in Section I that constitutes evidence of violations of Title 21, U.S.C., §§ 841, 843, and 846  (collectively, the "Target Offenses"), involving Ricardo BUSBEE ("R. BUSBEE"), Torrence BUSBEE ("T. BUSBEE"), Dalaquan MCGUIRE, Demarion GALLOWAY, Doretha HUGHES, and others known and unknown.

This warrant does not authorize the seizure of any tangible property.  In approving this warrant, the Court finds reasonable necessity for the seizure of the Location Information.  *See* 18 U.S.C. § 3103a(b)(2).

Pursuant to 2703(g), the presence of an agent is not required for service or execution of this warrant.

**Filed Under Seal**

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF**
**OHIO**
**WESTERN DIVISION**

| | |
|---|---|
| **IN THE MATTER OF THE SEARCH OF THE CELLULAR TELEPHONE ASSIGNED CALL NUMBER 937-716-0118 AND INFORMATION ASSOCIATED WITH THAT NUMBER THAT IS IN THE CUSTODY OR CONTROL OF AT&T** | **Case No.** 3:23-MJ-532<br><br>**Filed Under Seal** |

**AFFIDAVIT IN SUPPORT OF**
**AN APPLICATION FOR A SEARCH WARRANT**

I, Greg Orick, being first duly sworn, hereby depose and state as follows:

**INTRODUCTION AND AGENT BACKGROUND**

1.       I make this affidavit in support of an application for a search warrant under

Federal Rule of Criminal Procedure 41 and 18 U.S.C. §§ 2703(c)(1)(A) for information,

including location information, about the location of the cellular telephone assigned call number

937-716-0118, with unknown listed subscriber(s) (the "**TARGET CELL PHONE**"), whose

service provider is AT&T Wireless ("AT&T"), a wireless telephone service provider

headquartered at 11760 U.S. Highway 1, North Palm Beach, FL 33408.

2.        The **TARGET CELL PHONE** is described herein and in Attachment A, and the

information to be seized is described herein and in Attachment B.

3.       Because this warrant seeks, among other things, the prospective collection of

information, including cell-site location information, that may fall within the statutory definitions

of information collected by a "pen register" and/or "trap and trace device," *see* 18 U.S.C. §

3127(3) & (4), the requested warrant is designed to also comply with the Pen Register Act.  *See*

18 U.S.C. §§ 3121-3127.  The requested warrant therefore includes all the information required

to be included in an order pursuant to that statute. *See* 18 U.S.C. § 3123(b)(1).

4.　I am a Task Force Officer ("TFO") with the Drug Enforcement Administration ("DEA"). As such, I am an officer of the United States who is empowered by law to conduct criminal investigations of and to make arrests for offenses as detailed in 21 U.S.C. § 878. I have been a DEA TFO since August 2019. I have been employed in law enforcement since December 1999.

5.　I currently serve as a detective with the Dayton Police Department ("DPD"). I have been assigned to Patrol Operations and am currently assigned to the Narcotics Bureau. I have extensive prior experience in investigating drug cases that resulted in successful prosecutions of persons involved in the trafficking of drugs and gun related offenses. I have conducted narcotics-related arrests, executed search warrants that resulted in the seizure of narcotics and weapons, participated in undercover narcotics purchases, and supervised the activities of informants who have provided information and assistance resulting in narcotics purchases. Through training and experience, I am familiar with the manner in which persons involved in the illicit distribution and sales of controlled substances often operate. These subjects usually attempt to conceal their identities and the locations at which they reside, operate, or store drugs and drug proceeds.

6.　During my career with the DEA thus far, I have participated in an assortment of controlled substances investigations, including investigations involving marijuana, cocaine, heroin, methamphetamine, fentanyl, and counterfeit pharmaceuticals. To date, I have assisted in the investigation of financial crimes to include money laundering, structuring habits, and bulk cash smuggling. I have interviewed witnesses, subjects, and defendants involved in and/or arrested for drug violations, and have participated in several joint interagency federal and state investigations. Additionally, I have participated in and supervised the use of confidential sources, conducted physical surveillance, affected search warrants and arrest warrants, and

2

written numerous reports.  I have also written multiple affidavits in support of applications for arrest warrants and search warrants, including search warrants for searches of residences, cellular telephone location pings, and GPS trackers. Through my training, I have become familiar with coded terminology utilized by drug trafficking organizations to disguise their illegal activities and the manner in which they conduct these illegal activities.  Through my training and experience, including on-the-job discussions with other law enforcement agents and cooperating suspects, I am familiar with the activities of drug smugglers and drug trafficking distribution networks.

7.      The facts in this affidavit come from my personal observations, my training and experience, and information obtained from other agents and witnesses. This affidavit is intended to show merely that there is sufficient probable cause for the requested warrant and does not set forth all of my knowledge about this matter.

8.      Based on the facts set forth in this affidavit, there is probable cause to believe that violations of 21 U.S.C. §§ 841(a)(1) and 846 (possession with intent to distribute narcotics and conspiracy to commit the same) and 843(b) (use of a telephone communication facility to facilitate a Title 21 offense) have been committed, are being committed,  and/or  will be committed by Ricardo BUSBEE, Torrence BUSBEE, Dalaquan MCGUIRE, Demarion GALLOWAY, Doretha HUGHES, and others known and unknown.  There is also probable cause to believe that the location information described in Attachment B will constitute evidence of these criminal violations, and will lead to the identification of individuals who are engaged in the commission of these offenses.

9.      The court has jurisdiction to issue the proposed warrant because it is a "court of competent jurisdiction" as defined in 18 U.S.C. § 2711.  Specifically, the Court is a district court

of the United States that has jurisdiction over the offense being investigated, *see* 18 U.S.C. § 2711(3)(A)(i).

**PROBABLE CAUSE**

### A. Overview of the Investigation

10.     The United States, including the Drug Enforcement Administration Dayton Resident Office, is conducting a criminal investigation of a Drug Trafficking Organization ("DTO") involving Ricardo BUSBEE ("R. BUSBEE"), Torrence BUSBEE ("T. BUSBEE"), Dalaquan MCGUIRE, Demarion GALLOWAY, Doretha HUGHES, and others concerning potential violations of federal drug trafficking laws, including violations of 21 U.S.C. §§ 841(a)(1) (possession with intent to distribute and distribution of controlled substances), 846 (conspiracy to commit the same), and 843(b) (use of a telephone communication facility to facilitate a Title 21 offense). Throughout the investigation I have learned that this DTO is selling large quantities of fentanyl and/or fentanyl pills, cocaine, and methamphetamine in the greater Dayton, Ohio area.

11.     As I explain in more detail below, I believe that the DTO is responsible for several overdose events. I believe that obtaining both historical and prospective location data of the **TARGET CELL PHONES**, listed in the chart below, will lead to additional evidence of, among other things, the DTO's methods, members, and patterns of activity:

| TARGET CELL PHONE'S PRIMARY USER | TARGET CELL PHONE NUMBER & SERVICE PROVIDER | LOCATION(S) WHERE TARGET CELL PHONE USER ENGAGED IN DRUG ACTIVITY |
|---|---|---|
| R. BUSBEE aka "Cardo" | • 937-204-7506 (T-Mobile) <br> • 937-972-3966 (T-Mobile) | • 130 Laura Ave. (Sept. 2022—Sept. 2023) <br> • 210 Basswood Avenue (Sept. 2022— Sept. 2023) <br> • 820 Osmond Avenue (Sept. 2022—Present) <br> • 32 West Fairview Ave (spring-summer 2023) |
| MCGUIRE aka "Rico" | • 937-313-4128 (T-Mobile) <br> • 937-794-4752 (T-Mobile) | • 130 Laura Ave.(Sept. 2022— Sept. 2023) <br> • 210 Basswood Avenue (Sept. 2022— Sept. 2023) |
| GALLOWAY aka "Duke" | • 937-518-2205 (Verizon) | • 130 Laura Ave. (Sept. 2022—Sept. 2023) <br> • 210 Basswood Avenue (Sept. 2022— Sept. 2023) |
| T.BUSBEE aka "Woody" | • **937-716-0118 (AT&T)** | • 210 Basswood Avenue (Sept. 2022— Sept. 2023) |

12.     As I explain in more detail below, I learned the above information from a variety of sources, including a confidential and reliable informant of the DPD ("CS1")[1]. For context, CS1 has provided accurate and reliable information to the DPD regarding various investigations for several years. CS1 is a long-time resident of the Dayton, Ohio area, and has extensive personal

---

[1] CS1 has provided information to law enforcement in the past that has been independently corroborated. CS1 has never provided materially false information to law enforcement. CS1 is providing information to law enforcement for financial renumeration.

knowledge of the substance abuse culture in Dayton. CS1 explained that, since at least September 2022 (which is when CS1 first approached me with information about this DTO), the above DTO members—R. BUSBEE, MCGUIRE, GALLOWAY, T. BUSBEE, and HUGHES—have been working together to sell drugs, which CS1 knew based on personal observations. Customers could call any one of the **TARGET CELL PHONES** to order drugs from the DTO. CS1 identified several locations the DTO used to sell drugs, with 130 Laura Ave. and 210 Basswood Ave. being the busiest locations for drug sales. On September 12, 2023, following an investigation into the DTO, agents executed search warrants at several locations associated with the DTO—including 130 Laura Ave. and 210 Basswood Ave.—and seized evidence of the DTO's drug trafficking activities, including drugs, firearms, and numerous cell phones. As of the date of this affidavit, law enforcement is using forensic tools to try and access the seized cell phones, which remain locked.

13. CS1 explained that the DTO remains active through the date of this affidavit, and that the DTO members continue to use the **TARGET CELL PHONES** to sell drugs.[2] CS1 said that s/he has continued to contact R. BUSBEE at **TARGET CELL PHONE** numbers (937) 204-7506 and (937) 972-3966 since the September 2023 search warrant; likewise, CS1 said that s/he has continued to contact MCGUIRE at **TARGET CELL PHONE** numbers 937-313-4128 and 937-794-4752 since September 2023. The fact that CS1 has used these **TARGET CELL PHONES** to contact the DTO <u>after</u> the September 2023 search warrant supports my belief that the **TARGET CELL PHONES** remain active. Further, CS1 has purchased drugs from the DTO

---

[2] As I explain in more detail below, is unknown if the DTO members transferred their old phone numbers to new physical devices following the seizure of the cell phones on September 23, 2023; since we have been unable to break into the seized phones, I cannot confirm what call numbers those phones were assigned. Based on my training and experience, it is not uncommon for drug traffickers to transfer their same phone numbers/accounts to new physical devices.

within the past two months, further supporting my belief that the **TARGET CELL PHONES** are being used in furtherance of drug trafficking activity.[3]

14.     As I describe in more detail below, another confidential source (CS3) independently approached me in October 2023 and informed me that the DTO remains active and continues to use the **TARGET CELL PHONES** to sell drugs.

15.     CS1 and CS3 each told me that the DTO stopped using 130 Laura Ave. and 210 Basswood Ave. to sell drugs after the execution of the September 2023 search warrants. According to both CS1 and CS3, the DTO now uses different locations to sell drugs.

16.     As I explain in more detail below, due to the consistent and longstanding collaboration of the DTO members—which began prior to September 2022 and continues through the present—I believe that historical location data for the **TARGET CELL PHONES** will corroborate CS1's information; corroborate my observations of drug trafficking activity taking place at 130 Laura Ave. and 210 Basswood Ave. between September 2022- September 2023; reveal the relationships amongst the DTO members (e.g., reveal when, where, and who sold drugs on behalf of the DTO on any given day, including days associated with overdose events); reveal the location(s) of the DTO members' primary residences and/or other DTO stash houses; identify the DTO's source(s) of supply; and help identify any other coconspirators.

17.     For similar reasons, and as I explain in more detail below, I believe that prospective location data for the **TARGET CELL PHONES** will corroborate information from CS1 regarding the DTO's current stash house locations; reveal the who, when, and where of the DTO members' drug trafficking activities; reveal locations relevant to the DTO, such as DTO members' primary

---

[3] I am purposefully excluding additional details about CS1's drug purchase in order to shield CS1's identity.

residences where drug proceeds and/or luxury goods purchased from drug proceeds are likely stored; and identify coconspirators. Moreover, learning the current location of the **TARGET CELL PHONES** will allow investigators to apply for search warrants to seize the **TARGET CELL PHONES**, which I believe contain evidence of the DTO's past and current drug activities.

**B. In September 2022, law enforcement learned that drugs are being sold from the residences located at 130 Laura Avenue, Dayton, Ohio and 210 Basswood Avenue, Dayton, Ohio.**

18.      In September of 2022, CS1 relayed that R. BUSBEE and others are operating a "trap house" (i.e., a location used to package and sell drugs from).  CS1 reported that this behavior had been going on for some time—approximately several months—prior to September 2022.  CS1 stated that R. BUSBEE and his associates—MCGUIRE, GALLOWAY, and HUGHES—sell large amounts of crystal methamphetamine, fentanyl, and cocaine from the trap house and keep the drugs along with bulk United States Currency and handguns at the trap house.  CS1 stated the trap house was located at 130 Laura Avenue, lower left unit, Dayton, Ohio; investigators later determined this unit to be Apartment 1. CS1 provided 937-204-7506 (one of the **TARGET CELL PHONES**) as R. BUSBEE's phone number CS1 explained that the DTO members shared phone numbers and, in addition to using 130 Laura Avenue as a trap house, also used 210 Basswood Avenue, Dayton, Ohio, as a trap house.

19.      On September 23, 2022, CS1 and DPD conducted a controlled purchase of suspected fentanyl from R. BUSBEE at the rear of 130 Laura Avenue.  The controlled purchase was arranged through a non-recorded phone communication between CS1 and R. BUSBEE on R. BUSBEE's number 937-204-7506 (one of the **TARGET CELL PHONES**). During the phone communication, R. BUSBEE directed CS1 to go to the rear of 130 Laura Avenue for the purchase.

On or about September 23, 2022, based on information received from CS1, an amount of fentanyl was purchased at 130 Laura Avenue. I, along with DPD Sergeant Kelly Hamilton, witnessed this drug transaction, which took place at the rear of 130 Laura Avenue.

20.     For approximately the next ten months—between September 2022 and June 2023—I continued surveillance of 130 Laura Avenue and 210 Basswood Avenue using multiple investigative techniques in the hope of identifying all members of the DTO. These surveillance techniques included both physical and electronic methods. Throughout this time, I identified R. BUSBEE, GALLOWAY, and MCGUIRE at these locations while drug trafficking activity took place. The transactions appeared to have a pattern in that individuals would arrive at either location and make a phone call. Shortly thereafter, the individuals would approach the doors of the residence and make another phone call. Usually, in the case of 130 Laura Avenue, the rear entrance door would open and after a delay, a transaction would take place. In the case of 210 Basswood Avenue, after the second call, the individual would enter the front entrance door and almost immediately reappear and leave the area. On multiple occasions, I witnessed either R. BUSBEE, GALLOWAY, and MCGUIRE make what appeared, based on my training and experience, to be hand-to-hand drug transactions.

21.     On June 13, 2023, I used an electronic device to record a constant stream of "customers" coming and going from the rear of 130 Laura Avenue to meet with R. BUSBEE and/or GALLOWAY for short durations of time. This surveillance indicated that the "customers" would either walk or drive to the rear of the building, make a phone call, and wait on the rear stoop. After a short period of time, the rear entrance door would open, and what appeared to be a hand-to-hand transaction would occur. After the hand-to-hand transaction took place, the customer would immediately leave the area. Based on my training and experience, as well as my observations

during surveillance, this high volume and pattern of short-stay visitors is indicative of drugs being trafficked from this location.

22.     On June 16, 2023, members of the DEA Dayton RO were conducting surveillance of 130 Laura Avenue.  Investigators observed multiple individuals approach and conduct what appeared to me to be hand-to-hand drug purchases from R. BUSBEE at the back door of 130 Laura Avenue.  Investigators requested a traffic stop of a "customer" after they made contact with R. BUSBEE at the rear of 130 Laura Avenue.  At that time, a DPD marked cruiser initiated a traffic stop of the "customer," who cooperated with law enforcement and indicated that s/he just purchased cocaine from R. BUSBEE at 130 Laura Avenue.

**C. I learned that BUSBEE uses a black Cadillac to travel to and from 130 Laura Avenue.**

23.     During the traffic stop operation on June 16, 2023, agents witnessed R. BUSBEE drive a black Cadillac XTS, Ohio registration JUT5241. R. BUSBEE entered the black Cadillac, which was parked in front of 130 Laura Avenue, and drove away.  R. BUSBEE was the only occupant in the black Cadillac.  Later that day, agents witnessed R. BUSBEE return to 130 Laura Avenue in the black Cadillac, and park in front of the residence, then enter the residence through the front entrance door.

24.     Since June 16, 2023, agents have observed R. BUSBEE operating the black Cadillac on approximately a weekly basis. Agents have not seen anyone other than R. BUSBEE operating the black Cadillac. R. BUSBEE regularly drives the black Cadillac to and from 130 Laura Avenue.

**D. The evidence suggests that the drug trafficking activities that took place at 130 Laura Avenue were significant.**

25.     I received information from a DPD analyst that between January 2023 and August 2023 there have been twenty-six (26) documented fentanyl overdoses within a six-block radius of

130 Laura Avenue. Based on my training and experience, I know that drug users often purchase drugs from a seller located near them. This reduces the cost of transportation to the user, and decreases the likelihood of the user being detected by law enforcement. Furthermore, I know, based on my training and experience, that drug users frequently ingest the drugs they purchase immediately after receiving them or soon thereafter; therefore, it is likely that drug addicts purchasing drugs from 130 Laura Avenue would take the drugs while in the vicinity. For these reasons, I believe it is likely that many, if not all, of these twenty-six overdose events stemmed from drugs purchased from 130 Laura Avenue.

26.     On July 15, 2023, DPD uniformed officers responded to an aggravated robbery and felonious assault call for service at 130 Laura Avenue.  Upon the officers' arrival they witnessed the victim, T.R., bleeding profusely from his/her right hand, which had been shot.  T.R. pointed to 130 Laura Avenue and stated, "Apartment 1 sells drugs." T.R. said s/he knows this because "I buy drugs from them." T.R. then became uncooperative with officers and detectives and refused medical treatment. Based on my training and experience, I know that drug trafficking is a violent enterprise. I also know that drug traffickers frequently use firearms to protect themselves, their drugs, and their drug proceeds. Based on T.R.'s statements to officers—specifically, that T.R. said that drug trafficking was taking place from Apartment 1—I believe that T.R.'s injury was related to those drug trafficking activities.

27.     On July 27, 2023, DPD Detectives Mistan Bailey and John Howard responded to a fatal overdose at a residence located on Fotip Lane in Dayton, Ohio.  Two individuals overdosed: D.L. survived, but L.S. succumbed to the narcotics. During an interview with Detectives Bailey, Howard, and myself, D.L. said that after calling R. BUSBEE to buy cocaine, s/he arrived at 130 Laura Avenue to pick up the cocaine. D.L. was let into Apartment 1 by MCGUIRE's girlfriend,

HUGHES. HUGHES called an unknown individual to confirm the sale, then retreated to the kitchen area to collect the cocaine. After completing the transaction, D.L. and L.S. went to the decedent's apartment where the cocaine was divided up for use. L.S., after inhaling the cocaine, immediately became sweaty and dizzy, coughed, and said, "What was that?" D.L. inhaled the cocaine and immediately became drowsy. D.L. also said that s/he could taste an "acetone" chemical taste to the cocaine. Both individuals then "passed out."

**E. On August 15, 2023, R. BUSBEE was arrested after he drove the Cadillac XTS to a drug deal.**

28. On August 15, 2023, I was informed that the Montgomery County RANGE Task Force had arrested R. BUSBEE on a buy/walk operation. On that day, R. BUSBEE met a RANGE Task Force Confidential Informant ("CS2")[4] to sell him/her methamphetamine. R. BUSBEE, using the black Cadillac, transported the methamphetamine, arrived at the meeting location, and sold the methamphetamine to CS2. After selling CS2 methamphetamine, R. BUSBEE drove the black Cadillac away from the area. Law enforcement then traffic stopped R. BUSBEE and arrested him. Law enforcement recovered from inside the black Cadillac the drug proceeds from R. BUSBEE's sale with CS2. The currency recovered was separate from other monies in R. BUSBEE's possession.[5] Additionally, five cellular phones were seized during R. BUSBEE's

---

[4] CS2 has provided information to law enforcement in the past that has been independently corroborated. CS1 has never provided materially false information to law enforcement. CS2 is providing information to law enforcement for financial renumeration.

[5] Prior to the controlled buy, agents recorded the serial numbers of the currency CS2 used to complete the transaction with R. BUSBEE, which enabled law enforcement to confirm the currency seized from R. BUSBEE was the same.

arrest. After R. BUSBEE's arrest, the black Cadillac was towed to Sandy's Towing impound lot in accordance with police policy and procedures.

29. On August 15, 2023, I was conducting surveillance at 820 Osmond Avenue, Dayton, Ohio. I know that this location is R. BUSBEE's personal residence based on observations I've made over the course of my investigation, such as seeing R. BUSBEE enter the premises using a key to unlock the front door, and because R. BUSBEE lists it as being his address on his Ohio Identification Card. At approximately 6:35 p.m.—about two hours after R. BUSBEE had been arrested—I observed unknown individuals removing items from R. BUSBEE's residence at 820 Osmond Avenue, Dayton, Ohio. This activity is consistent with attempting to conceal evidence from law enforcement. I believe that R. BUSBEE directed these unknown individuals to move incriminating evidence because of a recorded phone call I listened to that R. BUSBEE had placed from the Montgomery County Jail following his arrest on August 15, 2023. R. BUSBEE remained in custody through August 21, 2023, and made a total of 25 connected phone calls to two numbers: phone number **937-716-0118** (one of the **TARGET CELL PHONES**), which is associated with R. BUSBEE's brother, T. BUSBEE, and phone number 213-422-1465, which is associated to a presumed girlfriend, "S█████."

30. The first jail phone call was to T. BUSBEE on August 15, 2023, during which R. BUSBEE told him to "clean his house." This is consistent with my observations of persons carrying boxes and items from 820 Osmond Avenue, Dayton, Ohio on August 15, 2023. In the jail phone calls, R. BUSBEE also discusses the transaction in which he was arrested. R. BUSBEE talked to "S███" on 213-422-1465 and discussed his incarceration. "S███" suggested to R. BUSBEE that he use another inmate's ID number so that a future call may be hidden from investigators. A subsequent call took place on August 18, 2023, to 213-422-1465 using inmate ID

#████, A████ G████, and the caller (whose voice matches that of R. BUSBEE) discussed with "S██" the possibility of "laying low" or running to another state, Tennessee, the west coast, or even Mexico. R. BUSBEE further described the traffic stop in which he was arrested. Additional phone calls to T. BUSBEE indicated that the items taken from the Osmond address were placed in a storage locker owned by "C████." C████ is believed to be C████ B████, the sister of R. BUSBEE and T. BUSBEE. Specifically, investigators listened to phone calls on August 17, 2023, with T. BUSBEE during which T. BUSBEE advised that C████ called the locker to see what was owed and apparently she made multiple calls that day. Additionally, investigators listened to a phone call to T. BUSBEE during which R. BUSBEE tells him to "get the 204 up. Go to Boost by KFC and get that 204." Based on investigators' knowledge of R. BUSBEE and the details of this investigation, investigators believe that R. BUSBEE was referring to R. BUSBEE's cell phone, which is (937) 204-7506 (one of the **TARGET CELL PHONES**), and requesting T. BUSBEE to get that number reactivated.

**F. On August 17, 2023, a GPS warrant for the black Cadillac was authorized.**

31. On August 17, 2023, I authored a Global Positioning System (GPS) warrant for the black Cadillac, Ohio license JUT5241. This warrant was reviewed and signed by the Honorable Sharon L. Ovington, U.S. Magistrate Judge.[6] Subsequently, the GPS unit was affixed to the vehicle.

**G. On August 18, 2023, a buy/walk occurred at 130 Laura Avenue.**

32. On August 18, 2023, members of the DEA Dayton RO conducted a buy/walk operation from the DTO. As with prior mode of operation for this DTO, a phone call was made

---

[6] Case No. 23-mj-348.

with the CS being directed to either 130 Laura Avenue or 210 Basswood Avenue. A Confidential Source ("CS3")[7] contacted phone number 937-518-2205 (one of the **TARGET CELL PHONES**) which is primarily associated with GALLOWAY and 210 Basswood Avenue. GALLOWAY advised CS3 that nothing was going on and hung up. CS3 then contacted phone number 937-794-4752 (one of the **TARGET CELL PHONES**) which is primarily associated with MCGUIRE and 130 Laura Avenue. MCGUIRE told CS3 that s/he could come by. Prior to CS3 arriving at 130 Laura Avenue, I observed an older white female conduct a transaction from the rear door of the residence, in which she placed a tan baggie into her brassiere. She then left the area. While CS3 arrived at 130 Laura Avenue, an additional vehicle pulled to the rear. A white male and a white female exited the vehicle and made their way to the rear door. The rear door opened, and an exchange took place after which they returned to their vehicle. I could then see the white male driver preparing a syringe needle for use. The driver then wrapped his right arm utilizing the seatbelt. He then reached over to his right arm. I could not see an injection taking place; however, the driver then closed his eyes and rested his head against the headrest of the vehicle. The needle was given to a rear female passenger and the vehicle left the area. The rear door of 130 Laura Avenue opened again, and a transaction took place with CS3. CS3 left the area and turned over to investigators one gram of fentanyl. CS3 stated the transaction for the fentanyl was with MCGUIRE.

//

//

---

[7] CS3 has been working with Dayton Police Department for monetary compensation. CS3 has provided information that has been independently corroborated. I have deemed CS3 to be reliable and credible.

**H. On August 29, 2023, a buy/walk occurred at 210 Basswood Avenue**

33.    On August 29, 2023, members of the DEA Dayton RO conducted a buy/walk operation for the DTO.  As with the prior mode of operation for this DTO, a phone call was made with the CS being directed to either 130 Laura Avenue or 210 Basswood Avenue.  A Confidential Source ("CS4")[8] contacted phone number 937-518-2205 (one of the **TARGET CELL PHONES**) which is associated with GALLOWAY and 210 Basswood Avenue.  MCGUIRE answered the phone and when asked, told CS4 to come to 210 Basswood Avenue.  CS4 arrived in front of 210 Basswood Avenue and entered the front entrance door.  CS4 explained s/he then went upstairs where s/he saw the right upper door open.  MCGUIRE exited that door and attempted to hand CS4 a baggie of heroin.  CS4 stated they wanted "hard" (referring to crack cocaine) at which time MCGUIRE went back into the apartment and then reemerged with a baggie of crack cocaine.  An exchange of U.S. Currency took place, after which CS4 then left the area.  CS4 then met with investigators and turned over the crack cocaine.  Based on CS4's description of the location, I believe MCGUIRE was using the apartment located on the upper west side of the building.

34.    Simultaneously, on August 29, 2023, I was conducting surveillance on the rear of 130 Laura Avenue. I observed an older white male drive to the rear and park.  The white male was on his cellular phone.  After a brief duration the white male exited his vehicle and went to the rear stoop and stood.  Shortly thereafter he called on his phone and stood by the rear door.  After approximately five minutes the rear door opened, and an exchange took place.  The white male reached out with what appeared to be U.S. Currency and in exchange took a clear baggie with a

---

[8] CS4 has been working with Dayton Police Department for judicial consideration.  CS4 has provided information that has been independently corroborated.  I have been deemed CS4 to be reliable and credible.

tan substance inside. The white male left the area. The rear door did not close but remained cracked open. It then opened completely to reveal R. BUSBEE as the individual inside 130 Laura Avenue who conducted the transaction.

35.     Investigators obtained toll records of R. BUSBEE's cell phone number 937-204-7506 (one of the **TARGET CELL PHONES**). In reviewing those tolls and identifying numbers, investigators identified a phone number that was subscribed to C█████ B█████. Based on the information in the jail call that "C█████" called the storage locker multiple times, investigators obtained toll records of C█████ B█████'s phone calls on August 17, 2023. Upon reviewing the toll records, investigators confirmed that C█████ B█████'s phone made two phone calls to Storage Rentals of America, located at 1830 Needmore Road, Dayton, Ohio 45414. Subsequently, investigators served an Administrative Subpoena on the person of record at that facility on August 31, 2023, for renter's information and unit numbers.

36.     On September 6, 2023, I obtained a list from the Person of Record at Storage Rentals of America. This list contained an entry in the name C█████ B█████, who is listed as currently leasing Unit 227. C█████ B█████ is shown to have begun her lease of Unit 227 on July 9, 2021.

37.     On September 7, 2023, I checked the passcode to Storage Rentals of America at 1830 Needmore Road that R. BUSBEE gives T. BUSBEE on the jail phone calls. When the passcode was utilized, the response was "Welcome, Ricardo," which I believe refers to R. BUSBEE whose first name is Ricardo.

38.     On September 7, 2023, DPD Detective Jeremy Stewart and his K-9 partner, Weston, responded to Storage Rentals of America to conduct an open-air sniff. Weston is a trained and certified narcotic detection dog. During the open-air sniff, Weston gave a positive response for narcotics on Unit 227.

**I. On September 12, 2023, investigators seized evidence of drug trafficking at Storage Rentals of America at 1830 Needmore Road; the residence located at 130 Laura Avenue, Apartment 1; and the residence located at 210 Basswood Avenue, Apartment 4.**

39.     On September 7, 2023, based on the above information, agents sought and obtained search warrants for 130 Laura Avenue, 210 Basswood Avenue, and 1830 Needmore Road, Unit 227.[9] On September 12, 2023, members of the DRO, assisted by Detroit Field Division SRT, DPD SWAT Team, and DPD detectives executed search warrants for these locations.

### a. The search of 1830 Needmore Road

40.     While serving the search warrant at 1830 Needmore Road, Unit 227, it was learned that R. BUSBEE rented Unit 249 at the same location. DPD Detective Stewart and his K-9 partner Weston, who was already on scene, conducted an open-air sniff. Weston is a trained and certified narcotic detection dog. During the open-air sniff, Weston gave a positive response for narcotics on Unit 249. A search warrant was authored and signed by the Honorable Caroline H. Gentry, United States Magistrate Judge, for Unit 249.[10] Agents searched Unit 249 and did not locate any items of evidentiary value.

41.     Agents recovered from Unit 227 the following items of evidentiary value, among others: thirteen firearms, including a sawed-off shotgun, an AR-15, an AK-47, and a MAC-10 variant; approximately 176 grams of a powdered substance that field-tested positive for cocaine; a blender bottle with white powdery substance; and a Black Samsung cellular telephone.

*//*

---

[9] Case Nos. 3:23-mj-363, 3:23-mj-364, and 3:23-mj-365, respectively.

[10] Case No. 3:23-mj-370.

**b. The search of 130 Laura Avenue, Apartment 1**

42.     HUGHES and MCGUIRE were present inside the apartment when agents executed the search warrant at 130 Laura Avenue, Apartment 1, on September 12, 2023. Agents seized one cell phone from HUGHES and two cell phones from MCGUIRE.

43.     Agents also recovered the following items of evidentiary value from inside the apartment: multiple plastic baggies containing suspected narcotics; a metal drug press with off-white powdery residue; a Bullet blender with white powdery substance; and a black digital scale with white powdery residue.

44.     In all, agents recovered the following electronic devices from 130 Laura Avenue, Apartment 1:

| Device Description | Location Seized |
| --- | --- |
| Green iPhone | 130 Laura Ave., Apt. 1, from MCGUIRE's person |
| Purple iPhone | 130 Laura Ave., Apt. 1, from HUGHES's person |
| Black iPhone | 130 Laura Ave., Apt. 1, top of refrigerator |
| Black iPhone | 130 Laura Ave., Apt. 1, from MCGUIRE's person |
| WIKO | 130 Laura Ave., Apt. 1, kitchen cabinet |

45.     As of the date of this affidavit, all the devices seized from 130 Laura Ave. are pending forensic analysis. Since we have not been able to access the contents of the phones, I do not know whether any of these devices were assigned the same call numbers as the **TARGET**

**CELL PHONES**. I know, based on my training and experience, that drug traffickers often keep the same phone number even when they switch devices because it allows them to stay in business (that is, their customers can continue to reach them).

### c. The search of 210 Basswood Avenue, Apartment 4

46.     GALLOWAY was present inside the apartment when agents executed the search warrant at 210 Basswood Avenue, Apartment 4, on September 12, 2023. Agents seized three cell phones from MCGUIRE.

47.     Agents also recovered the following items of evidentiary value from inside the apartment: multiple plastic baggies containing suspected narcotics; Benefiber, a common cutting agent; a black digital scale; and drug processing equipment.

48.     In all, agents recovered the following electronic devices from 210 Basswood Avenue, Apartment 4:

| Device Description | Location Seized |
|---|---|
| Black iPhone | 210 Basswood, Apt. 4, shoebox in living room |
| White iPhone | 210 Basswood, Apt. 4, from GALLOWAY's person |
| Pink iPhone | 210 Basswood, Apt. 4, from GALLOWAY's person |
| Black iPhone in red case | 210 Basswood, Apt. 4, from GALLOWAY's person |
| Black Alcatel cell phone | 210 Basswood, Apt. 4, south bedroom |

49.     As of the date of this affidavit, all the devices seized from 210 Basswood Ave. are pending forensic analysis. Since we have not been able to access the contents of the phones, I do not know whether any of these devices were assigned the same call numbers as the **TARGET CELL PHONES**. I know, based on my training and experience, that drug traffickers often keep the same phone number even when they switch devices because it allows them to stay in business (that is, their customers can continue to reach them).

**J. In or about November 2023, CS1 provided information suggesting that the DTO is responsible for multiple overdoses, and that the DTO members have consistently used the TARGET CELL PHONES in furtherance of their drug trafficking activities.**

50.     In November 2023, I met with CS1 to discuss the DTO. CS1 confirmed that CS1 has known the DTO members (R. BUSBEE, MCGUIRE, GALLOWAY, and T. BUSBEE) for several years. CS1 purchased controlled substances from each of these DTO members multiple times a week for at least from summer 2023 through late September 2023. CS1, who lives in the same neighborhood as some of the DTO members and has known the DTO members for **approximately 15-20** years,[11] has personally observed the DTO members working together to sell drugs since at least September 2022. CS1 knows the DTO to sell methamphetamine, crack cocaine, fentanyl, and sometimes marijuana.

51.     CS1 has used the below **TARGET CELL PHONE** numbers to arrange for drug purchases from the respective DTO member:

---

[11] To protect CS1's identity, I am not including specific details about where CS1 lives and precisely how long CS1 has known the DTO members.

| TARGET CELL PHONE'S PRIMARY USER | TARGET CELL PHONE NUMBER & SERVICE PROVIDER |
|---|---|
| R. BUSBEE aka "Cardo" | • 937-204-7506 (T-Mobile)<br>• 937-972-3966 (T-Mobile) |
| MCGUIRE aka "Rico" | • 937-313-4128 (T-Mobile)<br>• 937-794-4752 (T-Mobile) |
| GALLOWAY aka "Duke" | • 937-518-2205 (Verizon) |
| T.BUSBEE aka "Woody" | • **937-716-0118 (AT&T)** |

52.     When I asked CS1 for the phone numbers s/he used to buy drugs from the DTO, CS1 rattled off each of the above six phone numbers without pause and without needing to consult his/her cell phone. CS1 explained that s/he knows all the phone numbers by heart because s/he has called them so many times. CS1 explained that sometimes the DTO members would answer each other's phones. For example, sometimes CS1 would call one of the two phone numbers associated with R. BUSBEE, but MCGUIRE would answer and take CS1's drug order. CS1 would arrange to buy drugs from whichever DTO member answered the phone. CS1 knows that all the DTO members work together and that customers can use the numbers interchangeably to contact the DTO for drugs.

53.     In or about the summer of 2023, CS1 obtained a blood test to determine what exactly s/he was ingesting when s/he bought drugs from the DTO. CS1's blood test reflected that s/he had

cocaine, fentanyl, benzodiazepines, and xylazine in his/her system. CS1 had only purchased drugs from the DTO.

54. CS1 told me that s/he had consistently purchased drugs from the DTO at the multiple residences they operated: 130 Laura Avenue, 210 Basswood Avenue, 32 West Fairview Ave.,[12] Dayton, Ohio, and on at least one occasion, 820 Osmond Ave., Dayton, Ohio. CS1 explained that s/he would call R. BUSBEE, MCGUIRE, GALLOWAY, or T. BUSBEE on one of the **TARGET CELL PHONES** to obtain drugs, and would then be directed by whomever answered the phone to one of the foregoing residences to purchase drugs. CS1 explained that 130 Laura Avenue was the DTO's busiest location for drug sales. Oftentimes, when CS1 arrived to buy drugs, s/he observed lines of ten or more people waiting to purchase drugs. Originally, customers were directed to the front door of 130 Laura Avenue, but after a neighbor complained, the DTO instructed customers to come to the back door instead. I corroborated CS1's information by reviewing surveillance footage I had previously recorded at 130 Laura Avenue in the summer of 2023, which showed a steady stream of customers arriving at the back door of 130 Laura Avenue. I had previously corroborated CS1's information about the DTO's activities in September 2022 when CS1 and the DPD conducted a controlled buy from R. BUSBEE at 130 Laura Ave.

55. CS1 explained that when s/he arrived at either 130 Laura Avenue or 210 Basswood, the DTO member(s) present would usually direct CS1 to come inside. CS1 has been inside 130 Laura Avenue and 210 Basswood multiple times throughout 2023. When CS1 was inside these locations, CS1 observed multiple firearms and drugs. Specifically, CS1 observed drugs kept in

---

[12] CS1 explained that s/he purchased drugs from R. BUSBEE at 32 West Fairview Ave. during an approximately three-week period in spring-summer 2023.

bulk inside the kitchen cabinets. A DTO member would remove some of the drugs from the bulk quantity and weigh it on a digital scale before providing it to the customer. Oftentimes, CS1 observed firearms on the kitchen countertops and kitchen tables. CS1 said that R. BUSBEE[13] and GALLOWAY[14] often carried firearms on their person and answered the door with a firearm displayed on their hip.

56.     Typically present at 130 Laura Avenue were R. BUSBEE, MCGUIRE,[15] and MCGUIRE's girlfriend, HUGHES. CS1 explained that HUGHES would sell CS1 drugs approximately once a week; the rest of the time CS1 purchased drugs at 130 Laura Avenue from R. BUSBEE or MCGUIRE. If R. BUSBEE and/or MCGUIRE was out of town, then HUGHES would conduct all the drug sales at 130 Laura Avenue on the DTO's behalf.

57.     Typically present at 210 Basswood Avenue when CS1 arrived to buy drugs were GALLOWAY and T. BUSBEE.[16] CS1 explained that 210 Basswood Avenue was not as busy as 130 Laura Avenue.

58.     CS1 said that throughout CS1's time as a customer of the DTO, CS1 observed multiple people get sick immediately after ingesting the drugs purchased from the DTO. For example, at 130 Laura Avenue, CS1 saw people take the drugs they'd purchased and then stumble

---

[13] CS1 referred to R.BUSBEE by his street name, "Cardo." CS1 positively identified a photograph of R. BUSBEE as the individual s/he knows as "Cardo."

[14] CS1 referred to GALLOWAY by his street name, "Duke." CS1 positively identified a photograph of GALLOWAY as the individual s/he knows as "Duke."

[15] CS1 referred to MCGUIRE by his street name, "Rico." CS1 positively identified a photograph of MCGUIRE as the individual s/he knows as "Rico."

[16] CS1 referred to T. BUSBEE by his street name, "Woody." CS1 positively identified a photograph of T.BUSBEE as the individual s/he knows as "Woody."

in the backyard/alley behind 130 Laura Avenue before collapsing. CS1 has called 911 on at least three occasions due to individuals overdosing after taking the drugs that were just sold to them at 130 Laura Avenue. I was able to corroborate CS1's information by reviewing police records and reports during the salient time frame. I learned, for example, that another overdose victim, D.F., was staying in a building down the street from 130 Laura. D.F., whom CS1 knew personally, typically purchased cocaine from the DTO. On the day of D.F.'s overdose—May 19, 2023—D.F. was found deceased with a mirror and a line of powder, consistent with how cocaine is ingested. A subsequent autopsy report confirmed that D.F. had in fact ingested a fatal amount of fentanyl.

59.     I spoke with the Montgomery County coroner regarding L.S.'s death. The coroner, who performed the autopsy, confirmed that but for the fentanyl, L.S. would not have died. It appears, based on statements from survivors and CS1, that D.L., L.S., and D.F. thought that they were purchasing cocaine from the DTO, but were in fact sold fentanyl.

60.     CS1 has been present at 130 Laura Avenue and/or 210 Basswood Avenue when customers informed DTO members that the drugs the DTO had sold to them had caused them to overdose. On at least one occasion, CS1 heard R. BUSBEE laugh in response and on another occasion CS1 heard T. BUSBEE tell the customer who had overdosed that it was the customer's fault for becoming involved with drugs in the first place.

61.     Throughout 2023, CS1 has observed the DTO members wearing expensive clothes and other luxury items as well as pay for multiple rental cars. CS1 believes, based on CS1's observations and knowledge of the DTO's client base, that the DTO makes thousands of dollars a day in drug transactions.

62.     As of the date of this affidavit, all of the **TARGET CELL PHONES** remain active and, according to CS1, remain in use by their respective owners. CS1 has personal knowledge that

the two **TARGET CELL PHONES** associated with R. BUSBEE—(937) 204-7506 and (937) 972-3966—and the two **TARGET CELL PHONES** associated with MCGUIRE—313-4128 and 937-794-4752— are active and being used by the DTO because s/he has used all four of these **TARGET CELL PHONES** to contact the DTO. CS1 has also used the **TARGET CELL PHONES** to arrange for drug purchases from the DTO.

63.    I believe that all of the **TARGET CELL PHONES** contain evidence relevant to my investigation. As I described above, CS1 provided information that R. BUSBEE, T. BUSBEE, GALLOWAY, and MCGUIRE each used cell phones to communicate with CS1, other drug customers, and/or other DTO members.

**K. I believe that historical and prospective location data for the TARGET CELL PHONES will further my investigation of the DTO.**

64.    After the September 12, 2023, warrants had been executed, I conducted surveillance at 130 Laura Avenue and 210 Basswood Avenue. Based on my observations, it appears that MCGUIRE and HUGHES no longer reside at 130 Laura Avenue. Furthermore, it appears that GALLOWAY no longer resides at 210 Basswood Avenue. Based on my training and experience, I know it is common for drug traffickers to change their locations of operation after being detected by law enforcement. The previously observed activity at those two locations is no longer occurring.

65.    Recent information from confidential informants, including the information from CS1 described in more detail above, indicate that the DTO members have moved out of these locations; however, the DTO members have nevertheless continued to operate their drug trafficking activities albeit from new locations and on a smaller scale. Additionally, as described above, CS1 indicates that the DTO members are still using the same cell phone numbers previously used despite their previous cell phones being seized during the September 12, 2023, warrants. I

know, based on my training and experience, that drug traffickers rely on customers and sources of supply contacting them via cell phone to arrange for transactions; therefore, the DTO members likely kept their same cell phone numbers in order to continue selling drugs even after their previous cell phones were seized. The evidence suggests that the DTO continues to operate.

66.     In or about October 2023, CS1 and CS3 independently provided information to me regarding the DTO's current activities. CS1 and CS3 said that R. BUSBEE is dealing drugs from Dayton, Ohio residences located at 202 E. Bruce Ave. and 820 Osmond Ave. On or about October 27, 2023, I surveilled 202 E. Bruce Ave. and observed R. BUSBEE there. While R. BUSBEE was present at the residence, I observed frequent, short-stay traffic to the residence. Based on my training and experience, this pattern of activity is consistent with drug trafficking. It is also consistent with the traffic I observed at 130 Laura Ave. Additionally, I have seen a vehicle I know R. BUSBEE to drive located at both of these residences within the past several weeks.

67.     Based on my training and experience, I believe that R. BUSBEE, T. BUSBEE, HUGHES, MCGUIRE, and GALLOWAY, among others, were using Storage Unit 227; 130 Laura Avenue Apartment 1; and 210 Basswood Avenue Apartment 4 to sell and/or store illegal drugs, drug processing equipment, drug proceeds, and other tools of the drug trafficking trade. Further, based on the above information, I believe that these same DTO members are now using new addresses to sell and/or store illegal drugs, drug processing equipment, drug proceeds, and other tools of the drug trafficking trade using the **TARGET CELL PHONES**. Additionally, I know that drug traffickers typically use multiple cell phones in order to conduct their drug trafficking activities, all while attempting to elude law enforcement. I believe evidence of the DTO's drug trafficking activities, as well as the identity of as-yet unknown coconspirators, are likely stored on the DTO members' current cell phones (the **TARGET CELL PHONES**). I also believe that the

DTO members have communicated with and are communicating with each other using the **TARGET CELL PHONES**. Based on my training and experience, I know that DTO members need to communicate with each other to, for example, coordinate who will be at a specific location to sell drugs, and to ascertain whether the DTO needs to procure additional drugs to sell. I believe that these communications are stored on the **TARGET CELL PHONES** themselves. Also on the **TARGET CELL PHONES** are contact lists which likely include coconspirators, customers, and sources of supply.

68.     As I describe in more detail below, I believe that the **TARGET CELL PHONES** have the ability to record location data, communications, photographs, videos, and contact lists, all of which may aid in locating other stash house locations, identifying additional coconspirators, tracing drug proceeds (including evidence of luxury purchases), learning how they obtained firearms, and establishing the patterns and methods of the DTO. I believe that the **TARGET CELL PHONES** will contain such evidence and will help further investigators' understanding of each individual's role in the DTO, as well as the scope of the DTO. By learning the location of the **TARGET CELL PHONES**, investigators will be able to apply for subsequent search warrants to seize the **TARGET CELL PHONES**.

69.     Additionally, I know, based on my training and experience, that people typically keep their cell phones on their person or secured in their residences. I believe that tracking the location of the **TARGET CELL PHONES** will reveal where each DTO member lives. I know, based on my training and experience, that drug traffickers frequently store drugs, drug proceeds, and tools of the drug trafficking trade at their residences. I also know, based on information I've learned throughout this investigation, that the DTO members purchased luxury goods with their drug proceeds. I believe that the DTO members likely store luxury goods, such as expensive

28

clothes, at their residences. I thus believe that the historical and prospective locations of the **TARGET CELL PHONES** will lead investigators to locations where evidence of the drug trafficking scheme is stored.

70.     Furthermore, based on information obtained from CS1 and CS3, I believe that the DTO members are actively trafficking in narcotics. Tracking the prospective location of the **TARGET CELL PHONES** will allow investigators to conduct surveillance of the **TARGET CELL PHONES**' locations to determine, among other things, the relationships amongst the DTO members, such as how frequently they meet, and where they meet. This will provide information about possible stash house locations, sources of supply, and other coconspirators.

71.     Additionally, learning the historic location of the **TARGET CELL PHONES** beginning in September 2022 will help corroborate information from confidential sources, and will likely lead investigators to significant locations, such as the DTO's source(s) of supply, other stash house locations, and coconspirators' residences. This historic location data will also reveal the DTO's methods of operation, pattern of behavior, and details about the relationships amongst the DTO members (e.g., when and where DTO members sell drugs together.

**L.  AT&T likely has evidence relevant to my investigation.**

72.     Based on the facts set forth in this affidavit, there is probable cause to believe that the DTO members and/or their associates use the **TARGET CELL PHONES** to facilitate their drug trafficking activities in violation of Title 21 of the United States Code.  Specifically, there is probable cause to believe that T. BUSBEE and/or other DTO members use the **TARGET CELL PHONE** in furtherance of these drug trafficking activities. I believe that the information sought by this warrant will, among other things, help the investigative team monitor the location of the

**TARGET CELL PHONE** and determine the location and transportation method of drug shipments as part of the investigation into the Subject Offense**s** conducted by the DTO.

73.     Based on my training and experience, I know that cell phones contain vast amounts of personal data; therefore, people usually carry their cell phones with them on their person or store them nearby. I also know from my training and experience that in today's age it is typical for individuals engaged in criminal activity to possess multiple active cellular phones at one time. For example, many criminals have one phone that they use for personal communications (e.g., with family members) and another phone that they use to communicate with criminal associates.  For this reason, I believe that by monitoring the location of the **TARGET CELL PHONE**—and thus the **TARGET CELL PHONE's** user—agents and officers will be able to identify the primary residences used by the DTO members and other important locations, such as possible stash-houses.

74.     I believe that the historical information sought by this warrant will further my investigation by revealing, among other things, the DTO members' travel between September 2022 and the present. Learning where the DTO members traveled may help investigators discover the identity of the DTO's drug supplier, where drugs were stored, and other information about how the drug trafficking organization is being supplied and operated. The historical location data will also aid in corroborating information from confidential sources regarding dates and times of drug sales that led to overdose events.

75.     In my training and experience, I have learned that AT&T is a company that provides cellular telephone access to the general public.  I also know that providers of cellular telephone service have technical capabilities that allow them to collect and generate information about the locations of the cellular telephones to which they provide service, including E-911 Phase II data, also known as GPS data or latitude-longitude data and cell-site data, also known as

"tower/face information" or cell tower/sector records. E-911 Phase II data provides relatively precise location information about the cellular telephone itself, either via GPS tracking technology built into the phone or by triangulating on the device's signal using data from several of the provider's cell towers. [Cell-site data identifies the "cell towers" (i.e., antenna towers covering specific geographic areas) that received a radio signal from the cellular telephone and, in some cases, the "sector" (i.e., faces of the towers) to which the telephone connected. These towers are often a half-mile or more apart, even in urban areas, and can be 10 or more miles apart in rural areas. Furthermore, the tower closest to a wireless device does not necessarily serve every call made to or from that device. Accordingly, cell-site data is typically less precise that E-911 Phase II data.

76. Based on my training and experience, I know that AT&T can collect E-911 Phase II data about the location of the **TARGET CELL PHONE**, including by initiating a signal to determine the location of the **TARGET CELL PHONE** on AT&T's network or with such other reference points as may be reasonably available.

77. Based on my training and experience, I know that AT&T can collect historical and prospective cell-site data about the **TARGET CELL PHONE**. Based on my training and experience, I know that for each communication a cellular device makes, its wireless service provider can typically determine: (1) the date and time of the communication; (2) the telephone numbers involved, if any; (3) the cell tower to which the customer connected at the beginning of the communication; (4) the cell tower to which the customer connected at the end of the communication; and (5) the duration of the communication. I also know that wireless providers such as AT&T typically collect and retain cell-site data pertaining to cellular devices to which

they provide service in their normal course of business in order to use this information for various business-related purposes.

78.     In my training and experience, this information may constitute evidence of the crimes under investigation because the information can be used to identify the **TARGET CELL PHONE's** user or users, to assist law enforcement in surveilling the **TARGET CELL PHONE's** user during the commission of violations of the Target Offenses, to show where the **TARGET CELL PHONE's** user was at certain times relevant to the investigation, and to provide evidence of locations used by the suspect (such as residences and stash houses)

## BACKGROUND ON DRUG TRAFFICKERS

79.     Based on my training and experience, as well as my discussions with other law enforcement agents, I know that the following are common practices of drug dealers:

     i.    Drug dealers commonly store drugs and drug paraphernalia, including pipes, syringes, and rolling papers, in their residences, stash houses, and/or vehicles in order to have ready access to the drugs and/or paraphernalia in order to conduct their drug dealing business or to use those drugs personally;

    ii.    Drug dealers attempt to mask the distinct odors of particular drugs through the use of heat sealing and/or canning devices and/or aromatic substances such as laundry soap, dryer sheets, air fresheners, or axle grease;

   iii.    Drug dealers often dilute, or "cut," drugs in order to maximize the volume of drugs they have to sell, and thus their profits.  Drug dealers use various substances to dilute drugs, including mannitol, mannite, lactose, Vitamin B12, and MSM.  Drug dealers use equipment, such as scales, sifters, hammers, grinders, razor blades, glass panes, mirrors and kilo or pound presses as part of the dilution or "cutting" process.  Once the drug has been "cut," drug dealers usually will repackage it, often in smaller quantities, using masking agents, tape, heat sealers and heat sealed bags, ziploc bags, paper bindles, and/or other containers for redistribution.  It is common for drug dealers to maintain such equipment and supplies in their residences and stash houses;

   iv.    Drug dealers keep books, receipts, notes, ledgers, and other forms of records specifically relating to their drug distribution activities.  Because drug dealers often "front" drugs to their customers – that is, sell the drugs on credit – or receive drugs from their suppliers on credit, such documentation is necessary to keep track of the amounts paid and owed with respect to their customers and suppliers.  These ledgers are more commonly known as "pay/owe sheets" and

may be as simple as notations on miscellaneous pieces of paper or may be recorded more formally in notebooks or even computer spreadsheets, and are frequently encoded in order to protect those involved. Drug dealers often keep such records on their person or in their residences, stash houses, and/or vehicles;

v. Drug dealing is a cash business. Customers pay for drugs with cash and dealers commonly purchase drugs from their suppliers with cash. Drug dealers commonly keep large sums of currency, financial instruments, precious metals, jewelry, and other items of value which represent either the proceeds from drug sales or are intended for the purchase of controlled substances. When drug dealers amass such wealth, they often attempt to legitimize that wealth or otherwise conceal it and its origin from discovery by law enforcement. To accomplish this, drug dealers often use different techniques, including the use of foreign and domestic banks and their attendant services, including savings and checking accounts, securities, cashier's checks, money drafts and letters of credit to exchange drug proceeds into money that appears to come from a legitimate source. Drug dealers also purchase real estate or vehicles, and establish shell corporations and business fronts that they use to launder drug proceeds. Drug dealers often utilize fictitious or "straw-holder" owners to conceal the true ownership, vehicles, or other valuable items purchased with the proceeds of illicit drug sales. In addition, drug dealers often use wire transfers, cashier's checks, and money orders to pay for drugs or other costs relating to their distribution business. Drug dealers often keep these items of value, and records relating to them, on their person or in their residences, stash houses, and/or vehicles where they are concealed from law enforcement and readily available.

vi. Drug dealers go to great lengths to hide and secure the drugs, drug proceeds, other items of value and records relating to their drug business. This is to safeguard those items against robbery and keep them from law enforcement. These secure locations typically include safes, vaults, or other locked containers, as well as specially constructed concealed compartments such as those often found in vehicles used specifically to facilitate drug dealing. Other methods of concealment include the burial of such items underground, the use of locked vehicles, trailers, out buildings, sheds, and/or exterior closets, the use of natural spaces within walls, furniture, vehicles, and other areas, and the use of sealed cans and canning machines;

vii. Drug dealers often use the United States Postal Service or commercial express mail delivery companies, such as FedEx or UPS, to ship drugs and money to various points within the United States. They do so, at least in part, due to the convenience of the service and the availability of related internet and phone tracking services, speed of delivery, and to reduce their risk of arrest during the transportation of drugs from one place to another. They often use hand-written airbills, drop the packages near closing time, pay for such services in cash and utilize false or nominee names, addresses, and/or telephone numbers when using such services in order to further insulate themselves from detection by law enforcement. Drug dealers frequently maintain records relating to their use

33

of these services, such as receipts, copies of airbills, empty and/or previously used boxes, packing tape, packing popcorn/filler and other packaging materials, and package tracking records printed from the internet, at their residences, stash houses, and/or in their vehicles where they are available for reference.

viii.    Drug dealing is a business that involves numerous co-conspirators, from lower-level dealers to higher-level suppliers, as well as associates to process, package and deliver the drugs and persons to launder the drug proceeds. These persons frequently maintain listings of names, aliases, telephone numbers, pager numbers, facsimile numbers, physical addresses, and email addresses, sometimes encoded and sometimes not encoded, for the purpose of contacting their suppliers, customers, transporters, and others involved in their illicit drug distribution activities. These records are typically maintained on their person or in their residences, stash houses, and/or vehicles, so they are readily available in order to efficiently conduct their drug dealing business. Moreover, such records are often stored electronically within the memory of telephones, computers, and/or personal digital assistants such as iPhones;

ix.    Drug dealers often use cellular telephones, satellite telephones, pagers and text messaging devices, voicemail or answering machine systems, telephone calling cards, computers, email, and/or personal digital assistants such as iPhones in order to communicate with their suppliers, customers, transporters, and others involved in their illicit drug distribution activities. Drug dealers often keep these items on their person or in their residences, stash houses, businesses, and/or vehicles where they are readily available;

x.    Drug dealers often travel by car, bus, train, or airplane, both domestically and to and/or within foreign countries, in connection with their illegal activities in order to meet with co-conspirators, conduct drug transactions, or to transport drugs or drug proceeds. Documents relating to such travel, such as calendars, travel itineraries, maps, airline ticket and baggage stubs, frequent use club membership information and records associated with airlines, rental car companies, and/or hotels, airline, hotel and rental car receipts, credit card bills and receipts, photographs, videos, passports, and visas, are often maintained by drug dealers in their residences, stash houses, and/or vehicles where they are readily available for use or reference;

xi.    Drug dealers frequently possess firearms, ammunition, silencers, explosives, incendiary devices, and other dangerous weapons to protect their profits, supply of drugs, and persons from others who might attempt to forcibly take such items and/or harm them during transactions. Such weapons, which are often stolen or otherwise possessed illegally, are typically maintained on their person or in their residences, stash houses, and/or vehicles where they are concealed from law enforcement and readily available;

xii.    Drug dealers frequently take, or cause to be taken, photographs and/or videos of themselves, their criminal associates, their real and personal property, their weapons, and their drugs; and such items are often stored on their person, in their residences, and/or vehicles;

xiii. During the course of a search it is not uncommon to find items of personal property that tend to identify the person(s) in residence occupancy, control, or ownership of the place being searched vehicle, such as cancelled mail, deeds, leases, titles, registration information, rental agreements, photographs, videos, diaries, utility and telephone bills, tax documentation, travel documents, statements, passports, driver's licenses and/or identification cards, immigration documentation, birth certificates, and keys;

xiv. Drug dealers often utilize two-way radios, police scanners, video surveillance systems, and other counter surveillance equipment to prevent detection by law enforcement, and that such items are typically maintained at their residences, stash houses, and/or in their vehicles;

xv. Drug dealers often use their vehicles to transport contraband – including drugs, drug proceeds and firearms – and other evidence of their activities, and commonly use cellular telephones to coordinate their drug trafficking activities while they travel in their vehicles; and

xvi. Drug dealers frequently use drug proceeds to purchase luxury goods such as jewelry, watches, electronics, vehicles, and designer clothes and shoes. Drug dealers often display their wealth from the drug trafficking business in order to boost their drug trafficking sales and social status by marketing themselves as successful businessmen.

## AUTHORIZATION REQUEST

80. Based on the foregoing, I request that the Court issue the proposed search warrant, pursuant to Federal Rule of Criminal Procedure 41 and 18 U.S.C. § 2703(c).

81. I further request that the Court direct AT&T to disclose to the government any information described in Section I of Attachment B that is within its possession, custody, or control. Because the warrant will be served on AT&T, who will then compile the requested records at a time convenient to it, reasonable cause exists to permit the execution of the requested warrant at any time in the day or night.

82. I further request, pursuant to 18 U.S.C. § 3103a(b) and Federal Rule of Criminal Procedure 41(f)(3), that the Court authorize the officer executing the warrant to delay notice until 30 days after the collection authorized by the warrant has been completed. There is reasonable cause to believe that providing immediate notification of the warrant may have an adverse result,

as defined in 18 U.S.C. § 2705. Providing immediate notice to the subscriber or user of the Target Cell Phone would seriously jeopardize the ongoing investigation, as such a disclosure would give that person an opportunity to destroy evidence, change patterns of behavior, notify confederates, and flee from prosecution. *See* 18 U.S.C. § 3103a(b)(1). As further specified in Attachment B, which is incorporated into the warrant, the proposed search warrant does not authorize the seizure of any tangible property. *See* 18 U.S.C. § 3103a(b)(2). Moreover, to the extent that the warrant authorizes the seizure of any wire or electronic communication (as defined in 18 U.S.C. § 2510) or any stored wire or electronic information, there is reasonable necessity for the seizure for the reasons set forth above. *See* 18 U.S.C. § 3103a(b)(2).

83.     I further request that the Court direct AT&T to disclose to the government any information described in Attachment B that is within the possession, custody, or control of AT&T. I also request that the Court direct AT&T to furnish the government all information, facilities, and technical assistance necessary to accomplish the collection of the information described in Attachment B unobtrusively and with a minimum of interference with AT&T's services, including by initiating a signal to determine the location of the Target Cell Phone on AT&T's network or with such other reference points as may be reasonably available, and at such intervals and times directed by the government. The government shall reasonably compensate AT&T for reasonable expenses incurred in furnishing such facilities or assistance.

84.     I further request that the Court authorize execution of the warrant at any time of day or night, owing to the potential need to locate the Target Cell Phone outside of daytime hours.

85.     I further request that the Court order that all papers in support of this application, including the affidavit and search warrant, be sealed until further order of the Court. These

documents discuss an ongoing criminal investigation that is neither public nor known to all of the targets of the investigation. Accordingly, there is good cause to seal these documents because their premature disclosure may seriously jeopardize that investigation.

Respectfully submitted,

Gregory Orick
Task Force Officer
Drug Enforcement Administration

Subscribed and sworn to before me on December __10__, 2023 by telephone.

Peter B. Silvain, Jr.
United States Magistrate Judge

## ATTACHMENT A

## Property to Be Searched

1. The cellular telephone assigned call number 937-716-0118, with unknown listed subscriber(s) (the "Target Cell Phone"), whose service provider is AT&T Wireless ("AT&T"), a wireless telephone service provider headquartered at 11760 U.S. Highway 1, North Palm Beach, FL 33408.

2. Records and information associated with the Target Cell Phone that is within the possession, custody, or control of AT&T, including information about the location of the cellular telephone if it is subsequently assigned a different call number.

<u>**ATTACHMENT B**</u>

**Particular Things to be Seized**

I. **Information to be Disclosed by the Provider**

1. *Historical and Subscriber Information*. To the extent that the information described in Attachment A is within the possession, custody, or control of the Provider, including any information that has been deleted but is still available to the Provider or that has been preserved pursuant to a request made under <u>18 U.S.C. § 2703(f)</u>, the Provider is required to disclose to the government the following information pertaining to the Account listed in Attachment A for the time period **April 1, 2023, to present**:

   a. The following information about the customers or subscribers of the Account:

      i. Names (including subscriber names, user names, and screen names);
      ii. Addresses (including mailing addresses, residential addresses, business addresses, and e-mail addresses);
      iii. Local and long distance telephone connection records;
      iv. Records of session times and durations, and the temporarily assigned network addresses (such as Internet Protocol ("IP") addresses) associated with those sessions;
      v. Length of service (including start date) and types of service utilized;
      vi. Telephone or instrument numbers (including MAC addresses, Electronic Serial Numbers ("ESN"), Mobile Electronic Identity Numbers ("MEIN"), Mobile Equipment Identifier ("MEID"); Mobile Identification Number ("MIN"), Subscriber Identity Modules ("SIM"), Mobile Subscriber Integrated Services Digital Network Number ("MSISDN"); International Mobile Subscriber Identity Identifiers ("IMSI"), or International Mobile Equipment Identities ("IMEI");
      vii. Other subscriber numbers or identities (including the registration Internet Protocol ("IP") address); and
      viii. Means and source of payment for such service (including any credit card or bank account number) and billing records.

   b. All records and other information (not including the contents of communications) relating to wire and electronic communications sent or received by the Account, including:

      i. the date and time of the communication, the method of the communication, and the source and destination of the communication – i.e., call detail records - and records of data events across all networks (3G, 4G, 5G)
      ii. All historical location information, including data about which "cell towers" (i.e., antenna towers covering specific geographic areas) and

"sectors" (i.e., faces of the towers) received a radio signal from the Target Cell Phone for the time period **April 1, 2023, to present**. Included is any specialized location data commonly referred to as Network Element Location Service (NELOS), AriesoGeo, Per Call Measurement Data (PCMD), Real Time Tool (RTT), and/or Timing Advance/TruCall.

c. The Provider shall deliver the information set forth above within **7 days** of the service of this warrant and the PROVIDER shall send the information via facsimile or United States mail, and where maintained in electronic form, on CD-ROM or an equivalent electronic medium, to:

> Drug Enforcement Administration
> Attn: TFO Gregory Orick
> 3821 Colonel Glenn Hwy
> Beavercreek, OH 45342

2. *Prospective Location Information*. The Provider shall provide all prospective location information about the location of the **TARGET CELL PHONE** described in Attachment A for a period of **thirty days**, during all times of day and night. "Information about the location of the **TARGET CELL PHONE**" includes all available E-911 Phase II data, GPS data, latitude-longitude data, and other precise location information, as well as all data about which "cell towers" (i.e., antenna towers covering specific geographic areas) and "sectors" (i.e., faces of the towers) received a radio signal from the cellular telephone described in Attachment A. To the extent that the location information is within the possession, custody, or control of Provider, Provider is required to disclose the Location Information to the government. In addition, Provider must furnish the government all information, facilities, and technical assistance necessary to accomplish the collection of the Location Information unobtrusively and with a minimum of interference with Provider's services, including by initiating a signal to determine the location of the **TARGET CELL PHONE** on Provider's network or with such other reference points as may be reasonably available, and at such intervals and times directed by the government.

3. *Prospective Pen-Trap Information*. Pursuant to 18 U.S.C. § 3123, the DEA may install and use pen-trap devices to record, decode, and/or capture dialing, routing, addressing, and signaling information associated with each communication to or from the cell phones identified in Attachment A, including the date, time, and duration of the communication, and the following, without geographic limit:

- IP addresses associated with the cell phone device or devices used to send or receive electronic communications
- Identity of accounts that are linked by creation IP address, recovery email, telephone number, or other identifiers
- Identity of all accounts that are linked to the account by cookies

- Any unique identifiers associated with the cell phone device or devices used to make and receive calls with the cell phone identified in Attachment A, or to send or receive other electronic communications, including the ESN, MEIN, IMSI, IMEI, SIM, MSISDN, or MIN
- IP addresses of any websites or other servers to which the cell phone device or devices connected
- Source and destination telephone numbers and email addresses
- "Post-cut-through dialed digits," which are digits dialed after the initial call set up is completed, subject to the limitations of 18 U.S.C. § 3121(c)
- Source and destination telephone numbers
- Date, time, and duration of communication
- All data about the cell towers (i.e. antenna towers covering specific geographic areas) and sectors (i.e. faces of the towers) to which the Target Cell Phone will connect at the beginning and end of each communication. Included is any specialized location data commonly referred to as Network Element Location Service (NELOS), AriesoGeo, Per Call Measurement Data (PCMD), Real Time Tool (RTT), and/or Timing Advance/TruCall.

Pursuant to 18 U.S.C. § 3123(c)(1), the use and installation of the foregoing is authorized for **thirty days** from the date of this Order. Provider must furnish the government all information, facilities, and technical assistance necessary to accomplish the collection of the Location Information unobtrusively and with a minimum of interference with Provider's services, including by initiating a signal to determine the location of the **TARGET CELL PHONE** on Provider's network or with such other reference points as may be reasonably available, and at such intervals and times directed by the government.

## II.    Information to be Seized by the Government

1. All information described above in Section I that constitutes evidence of violations of Title 21, U.S.C., §§ 841, 843, and 846  (collectively, the "Target Offenses"), involving Ricardo BUSBEE ("R. BUSBEE"), Torrence BUSBEE ("T. BUSBEE"), Dalaquan MCGUIRE, Demarion GALLOWAY, Doretha HUGHES, and others known and unknown.

This warrant does not authorize the seizure of any tangible property.  In approving this warrant, the Court finds reasonable necessity for the seizure of the Location Information.  *See* 18 U.S.C. § 3103a(b)(2).

Pursuant to 2703(g), the presence of an agent is not required for service or execution of this warrant.